**Maria MILLER, Plaintiff–Appellant,**

v.

**AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, Defendant–Appellee.**

No. 92–2900.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1993.

Decided Sept. 7, 1993.

Donald T. Bertucci, Chicago, IL (argued), for plaintiff-appellant.

Claudia J. Lovelette (argued), Martin G. Durkin, Jr., Angela S. Curran, Burke, Bosselman & Weaver, Chicago, IL, for defendant-appellee.

Before CUMMINGS, POSNER and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

This case raises the interesting question of who, in a vacuum of responsibility, should have made certain that the proceeds of a minor's tort action were invested at an advantageous interest rate. They weren't, and the minor, Maria Miller, who has since reached majority, wants to blame American National Bank and Trust Co. ("American National") for squandering $110,998.17 in would-be interest. After Miller's mother died while giving birth to her, the family brought a medical malpractice action against St. Francis Hospital in Evanston, Illinois. In September 1975 when Maria was six, the case was settled for $250,000, of which her share was $76,855.85. Because of her age and presumably because of her father's irresponsibility and inexperience with money, Judge Irving R. Norman of the Circuit Court of Cook County ordered that her share of the settlement funds be:

> deposited in the American National Bank * * * in the maximum interest bearing accounts, in the name of Maria Miller, until

said minor reaches majority, or until further order of the Court.

(Plaintiff's app. at 2). A bank officer thus decided to invest the money in a six-year certificate of deposit ("CD")—good through September 5, 1981—that paid 7.5 percent interest or the highest interest rate then allowed by law.

Six years later, in September 1981, the bank had to decide what to do with the expiring CD, since Maria Miller was still six years shy of majority. The bank claims that it sent a letter to Raymond Miller, Maria's father, before the termination date on the account that advised:

> Your six year, 7½% investment account No. 30758173 will mature on September 7, 1981. If you wish to renew this account, no action is necessary. However, if you wish to choose another of our savings instruments, please notify our Customer Services Division, by mail or in person prior to maturity.

When it did not hear from Raymond Miller, the bank simply renewed the account for another six years at the same 7.5 percent interest rate. The bank's defense for its decision is that its duty to Maria Miller ended when it established the original account in 1975; any subsequent decisions were the responsibility of Raymond Miller. Mr. Miller contends that the bank was in charge, and that in any event he did not receive the letter the bank claims to have sent regarding the CD's termination in 1981. He also says that he never received a passbook for the account and did not sign a signature card. Indeed, Mr. Miller's mother submitted an affidavit to the district court swearing that her son has bad judgment when it comes to money and that, as a result, she asked the lawyer who handled the medical malpractice claim to structure the settlement such that Raymond Miller would have no control over Maria Miller's money (plaintiff's app., item 29). Whoever was ultimately responsible, the 1981 decision to roll over the funds into another six-year CD at a 7.5 percent interest rate was a profound disservice to the plaintiff because by 1981 Congress had removed the cap on interest rates. Thus exceedingly safe investments such as treasury bills had begun

to pay interest rates of between 14 and 17 percent. Indeed, the prime rate American National was paying on September 8, 1981, the day the bank renewed Miller's CD at 7.5 percent, was 20.5 percent (plaintiff's app., items 14, 19).

Miller brought this suit against American National. She offers three theories why the bank is responsible for the lost interest: it owed her a fiduciary duty, was the administrator and trustee of a constructive trust for her benefit, and committed negligence by investing her money in such a low-yielding account. Each claim hinges on the notion that American National owed her some duty. However, the late Judge Parsons found, and we are compelled to agree, that the bank had no such responsibility. He thus granted American National's motion for summary judgment and we affirm.

■ Under the law of Illinois which we must apply in this diversity action, a bank generally owes no fiduciary duty to its depositors. *Mijatovich v. Columbia Sav. & Loan Ass'n*, 168 Ill.App.3d 313, 316, 119 Ill.Dec. 66, 522 N.E.2d 728 (1st Dist.1988). The relationship consists simply of an arms-length transaction between debtor and creditor. *Gluth Bros. Constr., Inc. v. Union Nat'l Bank*, 166 Ill.App.3d 18, 23, 116 Ill.Dec. 365, 518 N.E.2d 1345 (2d Dist.1988), appeal denied, 121 Ill.2d 569, 122 Ill.Dec. 437, 526 N.E.2d 830 (1988). And no further duties by the bank are created by the fact that the funds have been deposited on behalf of a minor or incompetent person. *Gits v. Foreman*, 360 Ill. 461, 466, 196 N.E. 434 (1935); see *Mid–City Nat'l Bank v. Mar Bldg. Corp.*, 33 Ill.App.3d 1083, 1089, 339 N.E.2d 497 (1st Dist.1975); *Cicero State Bank v. Crowley*, 115 F.2d 1022, 1023 (7th Cir.1940).

■ Maria Miller and American National Bank did at one point have an association other than the standard bank/depositor relationship in that American National had been administrator of her mother's estate. In keeping with that role, Judge Norman ordered that American National deposit the $76,855.86 Miller received as settlement for her mother's untimely death in "maximum interest bearing accounts." But Illinois case law and expert testimony credited by Judge Parsons suggest that an administrator's job is merely to collect money from the estate, convert it to cash and distribute it. *Estate of Storer v. Storer*, 131 Ill.App.2d 1049, 1054, 269 N.E.2d 352 (5th Dist.1971); *In Re Estate of Kapraun*, 21 Ill.App.2d 231, 243, 157 N.E.2d 700 (2d Dist.1959). An administrator's job is completed after he has parcelled out the money, which may mean no more than putting it in a trust or in a bank account; in general, he does not have to remain involved until every last beneficiary has turned eighteen and spent the proceeds.

■ Should this case be any different? Perhaps. The court order arguably created a continuing responsibility by the bank to ensure that Miller's money was in the highest interest-bearing account until she reached eighteen when it directed American National to deposit the money in "maximum interest bearing accounts, in the name of Maria Miller, *until said minor reaches majority*, or until further order of the Court" (emphasis added). Read this way, the court order compelled the bank to safeguard Miller's settlement funds not merely at the time it first formed the account in her name but continuously over the twelve-year period until she reached majority; it could not just dump the money in an account and forget about it. But short of creating a fiction that the estate's funds were not actually disbursed until Maria Miller was eighteen years old—the law is reluctant to do this because few would agree to serve as estate administrators if the job dragged on for twelve or eighteen years—there is still no fiduciary obligation implicit in the relationship between bank and depositor.

Miller's better argument is not that the bank had any fiduciary obligation but was compelled under the terms of the state court's order to keep her funds invested at the highest rate possible. However, the plaintiff neither asked the state court to enforce the order nor pursued this line of reasoning in the district court. Indeed, Miller's attorney disavowed any such theory when we asked him about it at oral argument; thus the argument has been waived. In any event, we doubt whether Judge Norman real-

ly contemplated the bank's continuing participation in Miller's affairs as manager or administrator of her account, since he made no arrangements to have the bank paid for its services; and if the bank had expected to play such a role, it would undoubtedly have insisted on remuneration. Indeed, American National could not have acted as an administrator or manager to, for example, withdraw the money from the bank to reinvest or distribute the assets without obtaining another court order first. This suggests that the court itself, rather than the bank, retained control and responsibility.

Another possibility is that the bank had no generalized duty to oversee Miller's money after the initial distribution but assumed one by reinvesting the funds in 1981. After all, American National's decision benefitted mainly itself, because it was able to loan out Miller's money at a significantly higher interest rate than it paid to plaintiff—although the bank also bore the risk that interest rates would fall below 7½ percent during the ensuing six years, causing it to lose money. In any event, the decision about what to do with the money was thrust upon the bank by the silence of Raymond Miller after he was seemingly notified that the original CD was expiring. If no fiduciary obligation existed to begin with, a reluctant party cannot be saddled with such a duty by the inaction of others.

We conclude, therefore, that American National owed no fiduciary obligation to Maria Miller after it first set up the account in her name in 1975. Her claims about negligence and the creation of a constructive trust falter here as well, because both theories depend on the existence of a duty, which is absent in this case. See *Ray v. Winter*, 67 Ill.2d 296, 303, 10 Ill.Dec. 225, 229, 367 N.E.2d 678, 682 (1977) (in lieu of fraud, constructive trust requires a fiduciary duty); *Wimmer v. Koenigseder*, 108 Ill.2d 435, 440, 92 Ill.Dec. 233, 484 N.E.2d 1088 (1985) (one must breach a duty to commit negligence). The responsibility for keeping track of what was happening to Miller's money should have fallen on her guardian or on the Circuit Court, which in this instance drafted a vague and unsatisfactory order. American National will not win

any humanitarian awards for investing the child's money in one of the lowest interest-paying accounts available at the time, but we cannot say that it breached any legal obligation in doing so. The district court's decision is affirmed.